Charise SCHEMANSKY, Plaintiff,

v.

**CALIFORNIA PIZZA KITCHEN, INC., Defendant.**

No. 99–CV–75220–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 29, 2000.

David J. Szymanski, Sommers, Schwartz, Southfield, MI, for Charise R. Schemansky.

Charles C. DeWitt, Jr., DeWitt, Balke, Detroit, MI, for California Pizza Kitchen, Inc.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Elliott–Larsen sexually hostile work environment/retaliation case is pres-

ently before the Court on Defendant California Pizza Kitchen, Inc.'s Motion for Summary Judgment. Plaintiff Charise Schemansky has responded to Defendant's motion, to which Defendant has replied. The parties have waived oral argument on Defendant's Motion. Therefore, this matter will be decided on the briefs.

Having reviewed and considered the parties' briefs and supporting documents, and the entire record of this action, the Court is now prepared to rule on Defendant's Motion. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Plaintiff Charise Schemansky is a former employee of Defendant California Pizza Kitchen ("CPK"). Ms. Schemansky was hired by CPK as a server at its Somerset Mall restaurant in Troy, Michigan in August 1996. She remained employed at the Somerset Mall restaurant until her resignation on November 4, 1998.

During Plaintiff's tenure as a member of the CPK wait staff, Richard Trexler managed the Somerset Mall restaurant. Trexler was assisted in supervising the wait staff and kitchen employees by a number of assistant managers, including William Frank and Kirk Swanson.[1]

At the time of her hiring, Ms. Schemansky received a copy of CPK's Employee Handbook, which included the restaurant's "Harassment Policy." The Handbook provided as follows:

CPK believes all employees have the right to work in an environment free from all forms of unlawful harassment. The Company will not tolerate any kind of unlawful harassment, particularly sexual harassment, by any of its employees. Harassment (including sexual harassment) of one employee by another or by a supervisor is prohibited by both state

and federal law. At CPK, this is a major offense, which can result in disciplinary action and possible termination for the offender.

CPK's policy on harassment includes, but is not limited to, harassment based on a person's race, nationality, gender, religion, physical or mental disability, age, marital status and sexual orientation....

Employees who are subjected to or witness acts of possible sexual harassment or harassment based on race, nationality, gender, religion, physical or mental disability, age, marital status and sexual orientation must immediately bring the incident to management attention (including executive officers) without fear of reprisal.

See Defendant's Ex. 1B.

Ms. Schemansky admitted during her deposition that she was familiar with the CPK harassment policy and testified that she was also familiar with CPK's "Rock Line," a toll-free number that could be used by employees to contact corporate headquarters at any time, for any reason.

It appears undisputed that Plaintiff was a good server and CPK management had no problem with the performance of her server duties. Plaintiff's complaints in this action concern the treatment she was subjected to by the "back-of-the-house" (i.e., kitchen) staff. Plaintiff alleges that she was "harassed" and "cat-called" at work by members of the kitchen staff, most of whom were Hispanic. Although Plaintiff claims that she endured numerous incidents of harassment throughout the course of her employment with CPK, she admitted at her deposition that she never brought the issue to the attention of management until September 30, 1998.

---

1. Kirk Swanson was originally named as a party-defendant in this action. However, Plaintiff accepted a mediation evaluation of "0" damages with respect to her claims against Swanson. Therefore, pursuant to Michigan law, Swanson was dismissed from this action by operation of law. Swanson's dismissal ultimately enabled CPK to remove this case to this Court on diversity of citizenship grounds.

The specific incident Ms. Schemansky complained of on September 30, 1998 occurred when she placed a personal food order. (CPK employees are allowed food for their own consumption. However, pursuant to Company policy, the cooks are required to attend to personal food orders only *after* they prepared customer orders.) She alleges that one of the cooks, José Ramirez, did not make her meal promptly. She complained to him about having to wait for her food, and after she complained, she alleges that two other Hispanic cooks, Efrain Olivera and Leonel Peña called her names in Spanish.[2]

Plaintiff complained about the cooks' conduct to William Frank, the assistant manager on duty that day. Frank instructed Ramirez to make Ms. Schemansky's salad and instructed the cooks to treat the servers with respect. (Plaintiff does not allege that Frank was present in the kitchen when the alleged name-calling occurred and Frank testified that he did not hear to comments.) Frank later met with Ms. Schemansky to discuss the matter further.

Plaintiff testified that at this September 30 meeting with William Frank, she told him about being called names in Spanish and "about all sorts of sexual harassment and name calling and verbal abuse" that she had experienced at CPK.[3] The next

---

**2.** Specifically, Plaintiff alleges that Olivera and Peña called her "puta" and "pendejo." Plaintiff testified that she did not speak Spanish but believed the words meant "bitch" and "asshole."

**3.** At her deposition, Plaintiff testified as follows as to "harassment" she was subjected to prior to September 30, 1998 which she never reported to management until that date:

Q: When you say you told him [Frank] about all sorts of sexual harassment, name calling, and verbal abuse, you've told me the verbal abuse regarding the use of the terms puta and bendaho [sic; pendejo]. What else did you tell him? . . .
A: I can't recall the exact conversation. I remember telling him how for quite a while that many back of the house—that's what kitchen and bus staff were called—had harassed me and done different things and that I never wanted to get them in trouble, but that lately, that verbal abuse had gotten so out of control that it had to stop.
Q: When you say "they had harassed me," what do you mean by that?
A: I'm saying that on a daily basis when I came to my job that I was cat called, I was verbally abused in Spanish, I was flirted with. I mean, all kinds of sexual harassment. I had gestures made behind me; I was followed into walk-ins. There were several incidents that happened.
Q: And you found them offensive at the time they occurred?
A: I found them offensive for quite a while and would always just walk away from a lot of the situations kind of thinking they would stop. And the reason I wrote the 9–4 incident down even though it didn't happen at CPK, was because after that incident happened, and I basically told Efrain, Don't touch me, it got very verbally abusive for me at work.
[Plaintiff kept a diary of sorts of what she deemed to be every "significant" event of harassment beginning with the September 4, 1998 incident. A copy of these diary notes was produced at Plaintiff's deposition and marked as Plaintiff's Dep.Ex. 1. Plaintiff testified that she kept these notes at home and never provided them to CPK during the course of her employment.
With regard to September 4, Plaintiff wrote in her notes that she had gone dancing in Royal Oak with CPK co-workers and while she was dancing, one of the CPK kitchen workers, Efrain Olivera, inappropriately touched her. The next entry in Plaintiff's notes is dated 10–1–98. In this entry she recounts the 9–30–98 incident with the kitchen staff which was the first matter that she complained to management about.]
Q: So it's your testimony that things changed after September 4th 1998?
A: Yes, it is, that it got worse; that it got more hostile towards me.
Q: And before that date, you didn't find it something worth complaining about?
A: There were times—I never went to management. There were people that I worked with that I made comments to that had seen these things happen to, but I never really went to management about it. I never wanted—there were some of the guys that were friends with me and other guys that, you know, basically I didn't really have conversations with. And I didn't want to get everyone as a whole in trouble.
***
Q: Have you told me everything that you said to Bill Frank that evening of which you're aware?

day, Frank met separately with the kitchen staff and the wait staff to review CPK's harassment policy.[4] He emphasized CPK's "zero tolerance" of sexual harassment, and instructed the wait staff to work through the expediter to obtain their meals from the kitchen.[5] He instructed all of the restaurant staff to be respectful of one another. After conducting the staff meetings, Frank informed Richard Trexler, the restaurant general manager, about the incident involving Schemansky and the cooks.

A: Yes.
[Defendant's Ex 1, Plaintiff's Dep. pp. 29–33.]
With respect to pre-September 30, 1998 incidents, in addition to her generalized allegation of being verbally abused and flirted with "on a daily basis," at her deposition, Plaintiff testified about one specific incident which she claims she wrote in her notes on or about September 30th "when she started keeping notes" which, according to her note occurred "prior to the following incidents" [This page was a single loose page submitted as the first page of her collection of notes.] On this note Plaintiff wrote

Prior to the following incidents harassment occurred [sic] for many months. William Calderon? grabbed my breast and would always make sexual comments as well as stand behind me and act as if he were doing sexual movements. Witnessed by Scott Campbell & Marie Floresca.

[See Plaintiff's Ex. E.]
With regard to Calderon grabbing her breast, Plaintiff testified that this occurred when Calderon, who was a busboy, asked if he could borrow her pen. The pen was in Plaintiff's shirt pocket. She had a tray of drinks and Plaintiff signaled for Calderon to take the pen out of her pocket. He did and when he did, she said he grabbed her breast, and Maria and Scott witnessed it. [Plaintiff's Dep. pp. 151–2.] No testimony was given about the other allegations concerning Calderon as stated in the note.

4. Frank translated his counseling to the Hispanic cooks into Spanish.

5. The "expediter" works at the kitchen counter to facilitate the transfer of meals between the kitchen staff and the dining room.

6. Plaintiff testified at her deposition that the day after Trexler met with cooks, October 9, 1998, when she arrived for her shift she was greeted by Mr. Trexler who was the general manager of the restaurant. She said that

Trexler met with Schemansky later that week to discuss her concerns and he met separately with Peña, Olivera and Ramirez to question them about Schemansky's accusations. A few days later, Trexler required all restaurant employees—both kitchen and wait staff—to review CPK's sexual harassment policy and had them execute a "PK Harassment Policy Refresher." Both Trexler and his supervisor, Fred Morgan, subsequently met with Plaintiff regarding what she had reported to William Frank.[6]

Trexler criticized her work attire and asked her to get some new work pants because he thought that her pants were too tight. This criticism of her work pants is part of the basis of her claim of retaliation. Her testimony regarding this incident is as follows:

Q: So then, you say on October 9th, 1998, when you arrived for your shift you were greeted by Mr. Trexler....
A: Yes.
Q: And you say you were asked to buy new pants?
A: Yes.
Q: And that was done in a very offending manner?
A: Yes.
Q: He came up and leaned into your ear and whispered it to you?
A: Yes.
Q: And you found that to be offensive?
A: Yes.
Q: Any reason that it was particularly offensive to you?
A: Because I found it to be retaliatory for the fact that I said sexual harassment was occurring and only I was pulled aside and asked to get new pants in an offending manner.
Q: What kind of pants were you wearing that day?
A: Black pants.
Q: And they were Spandex. Right?
A: I don't know the exact nature of the fabric. They're pants that I had worn for quite a long time every day to work with no problem.
Q: Do you know if Mr. Trexler talked to other people about their wardrobe?
A: I believe that ... several [days later] there was a staff meeting that was preshift that everyone needed to get new pants.
*＊＊
Q: And you don't know who else he talked to [personally] about their pants?
A: No.

A few weeks later, on October 22, 1998, Schemansky once again complained to William Frank that Ramirez refused to timely prepare a salad for her. Schemansky became angry and testified that in response to her anger, the cooks once again called her names in Spanish.[7] Frank met with Schemansky later that evening and he indicated that Ramirez had apologized for the incident. Richard Trexler was informed of the incident the next day and he immediately suspended Ramirez.

The following week, on October 27, 1998, Plaintiff once again complained about the cooks. She complained to Kyle Van Zant, a manager trainee working that day, that Peña "acted like" he intended to spit in the meal he was preparing for her. Van Zant reported the incident to Trexler. Trexler investigated the matter and talked to the other wait staff personnel on duty that evening. No one had observed Peña spit or "act like" he intended to spit on Schemansky's food. Trexler also met with Peña and counseled him. (Peña denied

having done anything to Schemansky's food.)

Trexler then met with Schemansky on Friday, October 30, 1998 regarding the incident and his investigation into the matter. He informed her that the cooks denied that they had called her any inappropriate names in Spanish, intentionally delayed her food, or spit in her meal. Trexler also told Plaintiff that he had interviewed other wait staff members and that none of the other wait staff could confirm Schemansky's allegations.[8] Schemansky testified that after that meeting, she believed that Trexler was trying to resolve the problems she was having with the kitchen staff.

Plaintiff next worked Monday, November 2nd. When she reported to work that day, she handed her supervisors copies of a letter she had written memorializing her complaints of sexual harassment over the preceding few weeks. [See Defendant's Ex. 1C.][9] Trexler attempted to meet with

[Plaintiff's Dep. pp. 55–57.]

7. Other CPK employees testified that Schemansky had "a real temper tantrum" over the salad incident, that she referred to the cooks as "fucking Mexicans," and that she yelled, "I'm going to sue the shit out of this place." [See Depositions of Dana Tooley, Jacqueline Muha, Maria Floresca, Rochelle Ibarrola, Kyle Van Zant and Andrea Markel, Defendant's Exhibits 4–7, 9–10.]

8. Trexler also expressed concern regarding Schemansky's own use of vulgar language and her explosive behavior and warned her that such behavior was not appropriate while she was working.

9. The text of Plaintiff's letter is as follows:
Attention California Pizza Kitchen:
This letter is to memorialize previous complaints on my behalf to management regarding sexual harassment and discrimination. I have been subjected to these acts long before it was brought to your attention on September 30, 1998. At this time I had thought it would be appropriate to bring these matters to your attention because of the uncomfortable nature they were bringing to my work environment. As a result of me bringing this to your attention many unkind acts have occurred towards myself

from both employees and management. I would like to reiterate that there have been previous incidents that added up to me approaching management staff. On September 30th, I approached Bill Frank about an incident that occurred with kitchen staff and myself. While working a double that day I put a meal ticket in for myself, more than an hour later I still had not received my meal. I notified Bill Frank and a confrontation occurred with Jose Ramirez and Mr. Frank. At that point I was verbally abused by several of the kitchen staff in Spanish and asked if "I was looking for trouble." Upon ending my shift I spoke with Mr. Frank about the way I was treated that night and events that had occurred previously. On October 1st, Mr. Frank called a staff meeting to address the sexual harassment issue. From that day forth I have been laughed at, talked about, verbally abused, asked not to have any contact with kitchen staff, bus staff, or back of the house employees because it is "policy" as stated by general manager Rick Trexler. I was also singled out by Rick Trexler on the morning of October 9th and asked to purchase new work pants. I addressed this issue with regional manager of operations Fred Morgan in the afternoon of October 16th. I informed him that this matter was

Plaintiff to discuss her letter but she refused to meet with him.

On November 4th, Schemansky met with Fred Morgan once again. According to Schemansky, Morgan expressed his interest in resolving her concerns so that she would be comfortable to work again. At the end of the meeting, Schemansky agreed to stay and try to work things out. As with her October 30 meeting with Richard Trexler, Schemansky testified that she believed after meeting with Morgan on

November 4th that he was attempting to resolve her concerns.

Later that same day, November 4, 1998, Schemansky received a letter dated November 3, 1998 from Julie Thompson, CPK's Vice–President of Human Resources. [See Defendant's Ex. 1D.] Thompson noted in this letter that the restaurant management had attempted to schedule a meeting for everyone involved to discuss the incidents Schemansky had complained of, but Schemansky had refused to attend.[10] Thompson requested

not addressed as a staff issue, instead I was singled out in a very unprofessional matter. Previous to this incident I was able to wear the same uniform for nearly a year with no complaints by management. On October 22nd, there was yet another kitchen incident in which I was not given an order for a customer that was already rang in. I approached Bill Frank, he made sure I was given my order, later in the evening the matter was still being addressed by kitchen staff, and once again I was being verbally abused in Spanish. I approached Mr. Frank with my receipts to let him know the items were rang in and that there was no error on my part, he in turn snapped at me and told me he would handle the issue. Within moments Mr. Frank went on to congratulate his kitchen staff on a job well done. I felt this was very inappropriate on his behalf. I asked manager Kyle Vanzant if I could leave that I was very upset. Only moments later Mr. Frank approached me to let me know that the kitchen staff made a mistake and they were sorry. I told Mr. Frank that I was not apologized to and I was tired of coming to work and doing my job only to be verbally abused and harassed. I began to cry and we went to the office. I told him that I did not appreciate the way he handled the issue and yet once again I was treated with no regard for my feelings. I asked him if he would appreciate his wife going to her job and being called a "bitch" or "asshole." I told him the abuse had to stop and that I could not take it anymore. He consoled me and told me that he was very sorry and asked if he could do anything? After this complaint, my general manager never approached me concerning the matter until a much later date. On October 27th, after working a double shift I rang in a meal ticket for myself. I happened to glance over to the pasta area only to see Leonel Pena gathering spit in his mouth, watching me and

laughing with other kitchen staff. At that point I decided to keep an eye on him to see what he was doing. He continued the above mentioned actions. A short time later my meal was placed on the counter and he began to laugh hysterically and exited the kitchen. I informed my manager Kyle Vanzant of the incident and asked for my meal to be removed from my ticket. I was very upset. After working all day I deserved to eat a meal and not be threatened in anyway. Upon approaching the office I voiced my concern and anger to manager Kyle Vanzant. He told me "How sorry he was", and "that he could not believe I was being treated that way." It was not until returning to work the morning of October 30th that my general manager followed up on the last few weeks of complaints. At this time I was told that he was at the end of his rope and didn't know what to do. I was told that if I had one more outburst, that I would be terminated. That he could not substantiate my complaints. I feel as if I'm being treated as the problem instead of the issues at hand to be resolved. I've done what I was asked to avoid a hostile work environment. I have not spoken to any of the Mexican staff in an attempt to end the harassment and hostility. Yet I have been treated unfairly. What once were respectful relationships have been broken because of the manner that incidents have or have not been handled. I don't know that these feelings of betrayal will ever be repaired. I do know that the incidents that happened to me were inappropriate and I'm sure there are people in the restaurant who can substantiate my claims.
Sincerely,
Charise Schemansky

10. Thompson further stated that she had been in contact with Richard Trexler and that he recounted his October 30 meeting with Plaintiff and the steps he had taken in an attempt

that Schemansky call her so that they could discuss her concerns.

After receiving this letter, Schemansky participated in a conference call with Thompson and Bill Maruyama, CPK's Director of Risk Management. During that conference call, Thompson and Maruyama explained that they wanted to reach a resolution and they offered to travel from California to Michigan to meet with her. Although Schemansky testified that Thompson and Maruyama "wanted to basically do whatever they could" to resolve the issue, Schemansky told them that she would think it over and talk to her lawyer.

After that telephone conference call (and after talking to her lawyer), Schemansky wrote a resignation letter, resigning from CPK as of November 4, 1998. She never returned to work at CPK. Shortly after her resignation, Schemansky was hired as a server at the Rainforest Cafe. A month later, on December 22, 1998, Plaintiff filed her Complaint in Oakland County Circuit Court. Defendant subsequently removed the action to this Court after Plaintiff alleged for the first time in a mediation summary that she was seeking damages in excess of $75,000 and after a non-diverse defendant was dismissed by operation of law after Plaintiff accepted a "0" damages mediation evaluation as to that defendant.

In this action, Schemansky contends that she was "forced out of [her] employment at CPK because of the hostility and retaliation that came about after [she] talked to management about sexual

harassment." [11] In her Complaint, she alleges two counts arising under the Michigan Elliott–Larsen Civil Rights Act: hostile work environment sexual harassment (count I) and retaliation (count II). Defendant now moves for summary judgment.

## III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion. [12] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for dis-

---

to resolve the situation. Thompson also related to Schemansky in the letter that Trexler had informed her that he had counseled Schemansky "in reference to [her] use of profanity and [her] hostile tone with kitchen staff which preceded [her] complaint to managers." Plaintiff stated in her resignation letter that she found Julie Thompson's letter to be full of "untruthful accusations" and based her resignation, in part, on this alleged untruthfulness. [See Defendant's Ex. 1E.]

**11.** In addition to alleging that she was wrongfully chastised for use of foul language and temperamental outbursts, Plaintiff also alleges that she was retaliated against for her com-

plaints about sexual harassment when Richard Trexler told her to get some new pants to wear at work because the pants she was wearing were too tight. (According to Plaintiff this new pants directive was made on October 9, i.e., when Plaintiff met with Trexler for the first time to discuss her September 30, 1998 complaint to William Frank.)

**12.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles Alan Wright, Arthur R. Miller, Mary Lay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

covery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's motion for summary judgment in this case.

## B. *THE PRIMA FACIE CASE OF SEX DISCRIMINATION ON THE BASIS OF A HOSTILE WORK ENVIRONMENT UNDER MICHIGAN LAW*

The Michigan Elliott–Larsen Civil Rights Act broadly defines sexual discrimination as including sexual harassment, and includes within its definition of sexual harassment, conduct which creates a hostile work environment:

> Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

> \* \* \* \* \* \*

> (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating, hostile, or offensive ... environment.

M.C.L. § 37.2103(h).

To make out a *prima facie* hostile work environment claim under the Michigan Act requires establishing the following five elements:

(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior.

*Chambers v. Trettco, Inc.,* 463 Mich. 297, 614 N.W.2d 910, 915 (2000), quoting, *Radtke v. Everett,* 442 Mich. 368, 382–3, 501 N.W.2d 155, 162 (1993). As in most civil rights claims, the plaintiff retains the burden of persuasion at all times. *Radtke, supra.*

■ The Michigan Supreme Court has determined that an objective reasonableness standard must be utilized to determine whether a hostile work environment exists under the Michigan Elliott–Larsen Act. *Radtke, supra,* 442 Mich. at 398, 501 N.W.2d at 169. Thus, a sexually hostile work environment claim under Michigan law is actionable "only when, in the totality of circumstances, the work is so tainted by sexual harassment that a reasonable person would have understood that the defendant's conduct or communication had either the purpose or effect of substantially interfering with the plaintiff's employment, or subjecting the plaintiff to an intimidating, hostile, or offensive work environment." *Id.*[13] To satisfy this requirement, it is generally accepted that the plaintiff must establish that the complained sexual harassment was "severe" or "pervasive." *Dix v. Siemens Information Systems, Inc.,* 82 F.3d 417, 1996 WL 156695 (6th Cir.1996) (unpublished opinion; text available on WESTLAW) (applying Michigan law).

■ However, a violation of the Michigan Civil Rights Act predicated upon a claim of a sexually hostile work environment can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been put on notice of the sexual harassment. *Radtke, supra* at 396–97, 501 N.W.2d 155. The Michigan Supreme Court recently re-emphasized the plaintiff's burden of satisfying this requirement in *Chambers v. Trettco, Inc., supra:*

> Under the Michigan Civil Rights Act, an employer may avoid liability in a hostile environment case if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment. Such prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker or a supervisor of sexual harassment. An employer, of course, must have notice of alleged harassment before being held liable for not implementing action. [*Radtke, supra* at 396–397, 501 N.W.2d 155.]
>
> The bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some fault on the part of the employer. That is the essence of *Radtke*'s requirement that a plaintiff prove that the employer failed to take prompt and adequate remedial action upon notice of the creation of a hostile work environment.

614 N.W.2d at 916 (some citations and internal punctuation omitted).

■ As the foregoing standards make clear, an employer cannot be held accountable on a sexually hostile work environment claim for conduct prior to the time

---

**13.** As the Michigan Supreme Court explained in *Radtke,*

> [A] reasonableness inquiry is necessary to fulfill the purpose of the [Michigan Civil Rights] act. As noted, the purpose of the act is to combat serious demeaning and degrading conduct based on sex in the workplace, and to allow women the opportunity to fairly compete in the marketplace. The reasonableness inquiry, (i.e., objectively examining the totality of the circumstances) in a hostile work environment action, is simply a method of objectively determining whether a hostile work environment exist-

ed. The alternative would be to accept all plaintiffs' subjective evaluations of conduct, thereby imposing upon employers liability for behavior that, for idiosyncratic reasons, is offensive to an employee. We believe that such a result is contrary to both the plain meaning of the statute, as well as the statute's overall purpose. [Citation omitted.] To hold the contrary would delimit the act and ensure a deluge of unwarranted litigation in contravention of the act's purpose.

442 Mich. at 387, 501 N.W.2d at 164.

the plaintiff complained to her supervisors of which it was unaware. *See, Selph v. Gottlieb's Financial Services, Inc.,* 35 F.Supp.2d 564, 568 n. 3 (W.D.Mich.1999) (applying Michigan law). *See also, Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 350 (6th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989). This is true whether the hostile work environment claim is predicated upon harassing conduct of a co-worker or a supervisor. *Chambers v. Trettco, supra,* 614 N.W.2d at 918.

■ Turning to the facts of this case, although Plaintiff testified that she had been "verbally abused and flirted with on a daily basis" prior to September 30, 1998, and also testified about one specific pre-September 30 incident involving a bus boy, William Calderon, who allegedly grabbed her breast when reaching for a pen in the breast pocket of her blouse,[14] as Plaintiff herself admitted in her deposition, she never reported the Calderon incident and never complained to anyone at CPK about any of these pre-September 30, 1998 matters, other than to tell her manager, William Frank, on September 30th, without specification that she had been subjected to "verbal abuse" by the kitchen and bus staff "for quite a while" but had not reported it because she "never wanted to get anyone in trouble."[15] Not having reported any sexual harassment to anyone in CPK management prior to September 30, 1998, CPK cannot be held accountable for conduct which Plaintiff now complains of that occurred before that date.[16]

**14.** As noted above, Plaintiff testified that this incident occurred when Calderon asked if he could borrow her pen. The pen was in Plaintiff's shirt pocket. She was carrying a tray of drinks at the time and signaled for Calderon to take the pen out of her pocket. He did and when he did, she said he grabbed her breast. [*See* Plaintiff's Dep. pp. 151–52.]

**15.** Specifically, when asked what she told William Frank on September 30, 1998, in addition to her complaint about being called names in Spanish that day when she complained about not getting her food promptly, Plaintiff testified:

I can't recall the exact conversation. I remember telling him how for quite a while that many back of the house—that's what kitchen and bus staff were called—had harassed me and done different things and that I never wanted to get them in trouble, but that lately, that verbal abuse had gotten so out of control that it had to stop.

\*\*\*

I never went to management [before then]. There were people that I worked with that I made comments to that had seen these things happen to, but I never really went to management about it. I never wanted—there were some of the guys that were friends with me and other guys that, you know, basically I didn't really have conversations with. And I didn't want to get everyone as a whole in trouble.

[Plaintiff's Dep. pp 30–31.]

**16.** In Plaintiff's Response Brief, Plaintiff's counsel seeks to hold CPK accountable for pre-September 30, 1998 incidents by arguing that one of the restaurant's assistant managers, Kirk Swanson (who was originally named as a defendant but has now been dismissed from this action), engaged in sexual harassment himself. However, by presenting excerpts of Plaintiff's deposition, Plaintiff's counsel mischaracterizes Plaintiff's deposition testimony regarding Swanson's involvement. Furthermore, Plaintiff admitted in her deposition that she never reported Swanson's actions to anyone at CPK.

Plaintiff's full testimony (and counsel's colloquy) regarding Swanson's conduct is as follows:

Q: So why did you sue Kirk Swanson?
A: I didn't directly go after Kirk Swanson.
Q: Okay. What do you mean by that?
A: I didn't ask to go after Kirk Swanson. I didn't say I'm going after CPK and Kirk Swanson.
Q: Do you have any reason that you sued Kirk Swanson individually?
MR. SZYMANSKI (Plaintiff's counsel): You mean besides those stated in her Complaint?
Q: (BY MS. MRKOVICH–WILSON, Defendant's counsel): Can you state the facts for me on which you base a claim against Kirk Swanson?
MR. SZYMANSKI: You want to show her the Complaint?
MS. MRKOVICH–WILSON: Is that an objection or instructing the witness what to say?
MR. SZYMANSKI: No. I'm asking you to show her the Complaint. I'm not instructing the witness what to say. I'm asking if you want \*\*\* her to relate allegations based in her Complaint, show her the Complaint.

Accordingly, only Plaintiff's allegations of "sexual harassment" which occurred on and after September 30, 1998 will be considered in determining whether Plaintiff has made out a legally cognizable claim of sexually hostile work environment.

## C. *PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE WAS SUBJECTED TO HARASSMENT "BECAUSE OF SEX"*

Plaintiff's claim of having been subjected to a sexually hostile work environment is predicated upon the following allegations. First, Plaintiff alleges that on September 30, 1998, she placed a food order with one of the cooks, José Ramirez, but he did not make her meal promptly. She complained to him about having to wait for her food, and after she complained, she alleges that two other Hispanic cooks, Efrain Olivera and Leonel Peña called her names in Spanish, which Plaintiff understood to mean "bitch" and "asshole." She also alleges that a few weeks later, on October 22, 1998, Ramirez once again failed to timely prepare a salad for her. Schemansky became angry and testified that in response to her anger, the cooks once again called her names in Spanish, al-

> MS. MRKOVICH–WILSON: I'm not asking her to do that. I'm asking her why she's suing Kirk Swanson.
> MR. SZYMANSKI: If you don't recall tell her you don't recall.
> MS. MRKOVICH–WILSON: She doesn't need to be coached on how to answer.
> \*\*\*
> Q: (BY MS. MRKOVICH–WILSON): So why did you sue Kirk Swanson?
> A: I don't have the Complaint in front of me, so I don't know what the exact reasons are.
> Q: Now, you're telling me you need to have the Complaint in front of you now that we've been through that?
> A: I'm saying that I didn't go directly after Mr. Swanson; that was not my objective. That arose later after incidents were discussed about some of the … behavior that he was named in the lawsuit.
> Q: What incidents were discussed about Mr. Swanson's behavior?
> A: Mr. Swanson basically condoned the harassment. He was more of a friend than a manager.... He went on fishing trips, he had [the back-of-the-house staff] to their home—to his home for dinners for holidays; went in the mornings and you know, just—he was always in on the running jokes. He would talk to the staff about sexual issues, women in the restaurant, you know, there were always comments made. He condoned the behavior, basically.
> Q: What did he do to you personally?
> A: To me personally, he never made any gestures or any, any comments to me personally.... Never propositioned me, anything to that sort. \*\*\* It was more of a friendship situation or atmosphere, than a manager/employee atmosphere.
> \*\*\*

> Q: The day that you left California Pizza Kitchen—... it was your belief that Kirk Swanson condoned this behavior?
> A: Yes.
> Q: And who did you report that to?
> A: To my attorney.
> Q: Okay. Not to anybody else?
> A: No. I was already out of CPK.
> Q: Okay. And you never mentioned that to Mr. Trexler or to Mr. Morgan or to Miss Thompson or to Mr. Mariuma?
> A: Not that I remember, no.
> \*\*\*
> Q: Did you ever tell [Swanson] that you found [his behavior] offensive?
> A: No, I did not.

[Plaintiff's Dep. pp. 128–134]

In any event, as the Michigan Supreme Court made clear in *Chambers v. Trettco,* unlike *quid pro quo* sexual harassment for which a supervisor's actions can render an employer strictly liable, where, as here, the claim is one of hostile work environment even with respect to direct involvement by a supervisor, "the violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been put on notice of the harassment." 614 N.W.2d at 916. As indicated, Plaintiff admits that she never reported Kirk Swanson's behavior to anyone at CPK. Therefore, his conduct cannot be used to bring Plaintiff's complaints about pre-September 30, 1998 incidents into this action.

Plaintiff also subjectively believes that other managers must have been aware of the sexual harassment that the kitchen staff allegedly engaged in simply because "a lot of time, management would be coming through the hallway [adjacent to the kitchen] for different things," and, therefore, they should have heard "the remarks being made." The Plaintiff's subjective belief, however, is speculative, at best.

though she did not say specifically what names she was called. A third incident with the cooks which Plaintiff complains about occurred on October 27, 1998. This incident involved Leonel Peña. Plaintiff claims that on that date, Peña. "acted like" he intended to spit in the meal he was preparing for her.

As noted, to make out a *prima facie* hostile work environment sexual harassment claim, Plaintiff must establish that she was subjected to unwelcome conduct at work "on the basis of sex," that was "sufficiently severe or pervasive to create a hostile work environment." *Quinto v. Cross and Peters Co.,* 451 Mich. 358, 369, 547 N.W.2d 314, 320 (1996).

In construing the Michigan Act's terms "because of sex" and "on the basis of sex," the Michigan Supreme Court stated in *Koester v. City of Novi,* 458 Mich. 1, 580 N.W.2d 835 (1998):

> We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed....

> The bottom line in sexual harassment claims is that

> [the plaintiff] must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discriminat[ion] ... because of ... sex."

580 N.W.2d at 841–42, quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (internal citations and punctuation omitted).

Applying the foregoing to Plaintiff's allegations concerning her employment on and after September 30, 1998, it is clear that Plaintiff has presented no evidence that the kitchen staff at CPK mistreated her "because of [her] sex."

First, Plaintiff's general allegations of being continually "harassed" and "verbally abused" cannot withstand a motion for summary judgment. In this regard, Plaintiff's allegations are substantially similar to those of the plaintiff in *Quinto v. Cross and Peters, supra.*

In *Quinto,* the plaintiff sued her employer for violation of the Michigan Elliott–Larsen Act alleging a hostile work environment claim. She alleged that her supervisor subjected her to harassing comments about her sex, age and national origin. The plaintiff's evidence of a hostile work environment consisted of her affidavit testimony that her supervisor

> **"continually harassed me** by demeaning me and humiliating me in front of fellow employees.... **His conduct included comments regarding my age, my sex, my national origin and my ability to speak English ....** [A]ll of these incidents took place at work [and] I reported these incidents to my superiors."

The trial court granted the employer's motion for summary judgment, and the Court of Appeals and the Michigan Supreme Court affirmed.

The *Quinto* court found that

> Plaintiff's affidavit disclosed no specific instances of ethnic, sexist or "aegist" remarks hostile to a protected class from which an inference of a hostile work environment could be drawn. It did not describe with particularity when, where, or how plaintiff was harassed. Although, as the trial judge recognized, a single act by an employer may so poison the environment as to constitute discrimination, it does not follow that allegations of a push without evidence of conduct or communication violative of the act presents a claim to submit to a jury. Plaintiff's affidavit conclusorily states that Kujawski subjected her to harassing comments regarding her age,

sex, national origin, and ability to speak English. As a consequence, the trial court properly found that plaintiff did not establish the existence of a genuine issue of material fact on an essential element of her claim.

\*    \*    \*    \*    \*    \*

In conclusion, ... Plaintiff's affidavit did not satisfy her burden the opposing party; rather it constituted mere conclusory allegations and was devoid of detail that would permit the conclusion that there was such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed. The Court of Appeals properly affirmed the trial court's grant of summary disposition in favor of the defendant.

451 Mich. at 370–371, 547 N.W.2d at 320–321.

*Quinto* makes clear that Plaintiff's general allegations of "harassment" and "verbal abuse" are insufficient to sustain a claim of hostile work environment.

■ Plaintiff's particularized complaints likewise fail to amount to proof of gender animus. First, her complaints that Jose Ramirez did not promptly prepare her food, or that Leonel Peña "acted like" he intended to spit in her food, do not amount to "sexual harassment" under the Michigan Act. *See Selph v. Gottlieb's Financial Services, Inc., supra*, 35 F.Supp.2d at 568 (co-worker's "dirty looks" cannot be considered "sexual in nature.") Other servers at CPK have testified that their food orders were frequently delayed due to the volume of business at the restaurant, especially if the food order was for their own meal which would be afforded the lowest priority by the cooks pursuant to company policy. *See* Deposition of Dana Tooley, p. 11 ("At times, everybody doesn't get their food, a ticket gets lost or whatever, and things get misplaced or somebody gets the wrong food, things happen. We work in a restaurant, it's imperfect.") *See also*, Deposition of Fina Carollo, p. 16 (food delays happen "[a]ll the time.")

■ Finally, Plaintiff has identified only two "epithets"—that on September 30, 1998, she was called a "bitch" and an "asshole" in Spanish by Leonel Peña and Efrain Olivera when she complained to Jose Ramirez about him not having her food order ready. Although such name-calling may be characterized as inappropriate, it does not constitute evidence of unlawful harassment "because of sex." *See, e.g., Galloway v. General Motors*, 78 F.3d 1164, 1167 (7th Cir.1996) (male co-worker's comments that the plaintiff was a "sick bitch" was not actionable sex or gender-related conduct under Title VII). *See also, Linebaugh v. Sheraton Michigan Corp.*, 198 Mich.App. 335, 497 N.W.2d 585, 588 (1993), *app. denied*, 444 Mich. 942, 512 N.W.2d 847 (1994) (cartoon circulated in the workplace depicting plaintiff and a male co-worker engaging in a sexual act was "gender neutral" and held insufficient to support a claim of sexual harassment under the Michigan Act).

### D. PLAINTIFF HAS NOT SHOWN THAT SHE WAS SUBJECTED TO SEVERE OR PERVASIVE HARASSMENT

■ Even assuming that Plaintiff's three particularized complaints about the kitchen staff's behavior amounted to harassment "because of her sex," Plaintiff has failed to establish that such harassment was objectively "severe or pervasive." The determination of whether an environment is "hostile" requires consideration of the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

As noted, Plaintiff's hostile work environment claim arises out of three incidents involving two conflicts with the kitchen

staff regarding the preparation of her food and one incident of being called a "bitch" and an "asshole" in Spanish by two employees.

The Supreme Court has made clear that the "mere utterance of an ... epithet which engenders offensive feelings in a employee," is insufficient to establish a hostile work environment claim. *Harris, supra,* 510 U.S. at 21, 114 S.Ct. at 370, quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). It is only when the workplace is "permeated" with discriminatory intimidation, ridicule and insult that the Civil Rights laws are implicated. *Id.* The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *Bowman v. Shawnee State University,* 220 F.3d 456, 463 (6th Cir.2000). "The issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case. The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Id.* (Citations and internal punctuation omitted.)

Applying the foregoing standards, in *Black v. Zaring Homes,* 104 F.3d 822 (6th Cir.1997) *cert. denied,* 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997), the Sixth Circuit reversed a jury verdict that had been entered in favor of the plaintiff on a Title VII sexually hostile work environment claim. The court found that sexually suggestive comments made repeatedly by plaintiff's male co-workers in her presence at bi-weekly staff meetings for a period of more than three months "were merely offensive and were not pervasive or severe enough to create a hostile work environment." *Id.* at 826. The court explained, "Although the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was not designed to purge the workplace of vulgarity." *Id.* (Citation omitted.)

In *Harrington v. Boysville of Michigan, Inc.,* 145 F.3d 1331, 1998 WL 252755 (6th Cir.1998) (unpublished opinion; text available on WESTLAW), the court found that the plaintiff's evidence of her supervisor calling her a "dumb broad" and a "bitch" on three separate occasions insufficient proof of a hostile work environment ("[T]he comments allegedly made by Clark were not as frequent as were those in *Black,* nor were they physically threatening or humiliating...." 1998 WL 252755 at *4.)

Similarly, in *Dix v. Siemens Information Systems, Inc., supra,* the court affirmed a grant of summary judgment in favor of the defendant-employer on an Elliott–Larsen hostile work environment claim finding that the plaintiff's evidence that during her five years at Siemens she had to put up with occasional non-sexual, nonsexist vulgarities and two clearly sexist comments was insufficient to establish a *prima facie* claim of the existence of a sexually hostile work environment. *See also, Burnett v. Tyco, Corp.,* 203 F.3d 980 (6th Cir.2000) (plaintiff's supervisor's placing of a pack of cigarettes and a lighter inside plaintiff's tank top and brassiere and his isolated lewd comments over a five-month period held insufficient to support a hostile work environment claim). *Compare, Williams v. General Motors Corp.,* 187 F.3d 553 (6th Cir.1999) (hostile work environment claim established by fifteen separate incidents of sexual harassment over a period of one year which included derogatory and profane remarks directed at the plaintiff, sexually explicit comments directed at the plaintiff, offensive comments directed at women in general, denial of plaintiff's overtime, and the

exclusion of plaintiff from certain workplace areas.)

By application of the foregoing authorities, it is clear that Plaintiff here has failed to establish that she was subjected to severe and pervasive harassment because of her sex. At best, Plaintiff has presented evidence of no more than a few isolated incidents of inappropriate and offensive conduct on the part of a few co-workers that cannot be fairly characterized as being directed against Plaintiff "because of her sex."

E. *DEFENDANT CPK TOOK PROMPT AND REMEDIAL ACTION IN RESPONSE TO PLAINTIFF'S COMPLAINTS*

Even assuming *arguendo* that Plaintiff has sufficiently proven that she was subjected to severe and pervasive sexual harassment, her hostile work environment claim nonetheless is deficient because Plaintiff has failed to establish that CPK failed to take prompt and adequate remedial action once she notified her managers of the kitchen staff's conduct. It is the Plaintiff's burden to prove that her employer failed to take prompt and adequate remedial action. *Chambers, supra; Radtke, supra.*

As set forth above, Plaintiff first complained about the kitchen staff's conduct on September 30, 1998 to William Frank, the assistant manager on duty that day. After hearing what Plaintiff had to say, Frank instructed Ramirez to make Ms. Schemansky's salad and instructed the cooks to treat the servers with respect. Frank later met with Plaintiff to discuss the matter further. Plaintiff testified that at this end-of-the-day September 30 meeting with William Frank, she told him about being called names in Spanish and "about all sorts of sexual harassment and name calling and verbal abuse" that she had experienced at CPK.

The next day, Frank met separately with the kitchen staff and the wait staff to review CPK's harassment policy. He em-phasized CPK's "zero tolerance" of sexual harassment, and instructed the wait staff to work through the expediter to obtain their meals from the kitchen. He instructed all of the restaurant staff to be respectful of one another.

After conducting the staff meetings, Frank informed Richard Trexler, the restaurant general manager, about the incident involving Plaintiff and the cooks. Trexler met with Plaintiff later that week to discuss her concerns and he met separately with Peña, Olivera and Ramirez, the three kitchen employees who Plaintiff complained about, to question them about Plaintiff's accusations. A few days later, Trexler required all restaurant employees—both kitchen and wait staff—to view a video on CPK's sexual harassment policy and had them execute a "PK Harassment Policy Refresher." Both Trexler and his supervisor, Fred Morgan, subsequently met with Plaintiff regarding what she had reported to William Frank.

A few weeks later, on October 22, 1998, Plaintiff once again complained to William Frank that Ramirez again refused to timely prepare a salad for her and told him that when she became angry with Ramirez, the cooks once again called her names in Spanish. Frank met with Plaintiff later that evening and he indicated that Ramirez had apologized for the incident. Richard Trexler was informed of the incident the next day and he immediately suspended Ramirez.

On October 27, 1998, Plaintiff once again complained about the cooks, this time to Kyle Van Zant, a manager trainee working that day, claiming that Peña "acted like" he intended to spit in the meal he was preparing for her. Van Zant reported the incident to Trexler. Trexler investigated the matter and talked to the other wait staff personnel on duty that evening. His investigation revealed, however, that no one had observed Peña spit or "act like" he intended to spit on Plaintiff's food. Trex-

ler, nonetheless, met with Peña and counseled him.

Trexler then met with Plaintiff on Friday, October 30, 1998 regarding the incident and his investigation into the matter. Plaintiff testified that after that meeting, she believed that Trexler was trying to resolve the problems she was having with the kitchen staff.

Plaintiff next worked Monday, November 2nd. When she reported to work that day, she handed her supervisors copies of a letter she had written memorializing her complaints of sexual harassment over the preceding few weeks. Trexler attempted to meet with Plaintiff to discuss her letter but she refused to meet with him.

On November 4th, Plaintiff met with Fred Morgan once again. According to Plaintiff, Morgan expressed his interest in resolving her concerns so that she would be comfortable to work again. At the end of the meeting, Plaintiff agreed to stay and try to work things out. As with her October 30 meeting with Richard Trexler, Plaintiff testified that she believed after meeting with Morgan on November 4th that he was attempting to resolve her concerns.

Later that same day, November 4, 1998, Plaintiff received a letter dated November 3, 1998 from Julie Thompson, CPK's Vice–President of Human Resources, who is based in California. Thompson requested that Plaintiff call her so that they could discuss her concerns. After receiving this letter, Plaintiff participated in a conference call with Thompson and Bill Maruyama, CPK's Director of Risk Management. During that conference call, Thompson and Maruyama explained that they wanted to reach a resolution and they offered to travel from California to Michigan to meet with her.

Although Plaintiff testified that Thompson and Maruyama "wanted to basically do whatever they could" to resolve the issue, Plaintiff told them that she would think it over and talk to her lawyer. After that telephone conference call (and after talking to her lawyer), Plaintiff wrote a resignation letter, resigning from CPK as of November 4, 1998.

As the foregoing demonstrates, CPK's managers responded *each time* that Plaintiff complained about her co-workers. William Frank spoke to the cooks immediately after Plaintiff complained on September 30th and the very next day, he conducted meetings with the entire restaurant staff regarding respectful conduct and CPK's sexual harassment policy.

Richard Trexler, the restaurant's general manager also met with and counseled the cooks and interviewed other restaurant staff members concerning Plaintiff's allegations. He, in fact, suspended Jose Ramirez after Plaintiff's second complaint about his conduct. Fred Morgan, the District Director, also met with Plaintiff to address her concerns, and headquarters management personnel also addressed Plaintiff's complaints.

The relevant inquiry concerning the adequacy of the employer's remedial action is "whether the action reasonably served to prevent future harassment of the plaintiff." *Chambers v. Trettco, supra,* 614 N.W.2d at 919. Thus, as the Sixth Circuit observed in *Bell v. Chesapeake & Ohio Railway,* 929 F.2d 220, 224 (6th Cir.1991), "an appropriate, corrective response will vary according to the frequency and severity of the alleged harassment." However, a harassment victim may not dictate an employer's corrective action against a co-worker. *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 874 (1997).

As indicated above, Plaintiff complained about being called names in Spanish and being treated rudely by the kitchen staff. CPK responded by investigating the matter, interviewing employees, counseling, and where appropriate, suspending the culpable parties, as well as re-educating the staff about sexual harassment and the company's sexual harassment policy. Plaintiff has not produced any evidence to

suggest that, under the circumstances presented, CPK's actions were not adequate. Indeed, she testified that she was satisfied that CPK's actions as of November 4, 1998, and believed that Richard Trexler, Fred Morgan, Julie Thompson and Bill Maruyama all were sincere in their attempts to resolve her concerns.

Under these circumstances, the Court finds that Plaintiff has failed to carry her burden of proving that her employer did not take prompt and adequate remedial action in response to her complaints concerning the kitchen staff and her allegations of sexual harassment.

### F. PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE WAS CONSTRUCTIVELY DISCHARGED

■ Plaintiff has also alleged a claim of constructive discharge, claiming that as a result of the sexually hostile work environment at CPK, she was forced to resign. Under Michigan law, "a constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 776 n. 10 (6th Cir.1996) (applying Michigan law). *See also, Selph, supra*, 35 F.Supp.2d at 566 (constructive discharge occurs only when "the employer deliberately makes an employee's working conditions ... intolerable.")

■ As indicated above, however, Plaintiff testified that right up through her last day of work, she believed that CPK and its managers were sincerely trying to

resolve the problems she was having with the kitchen staff. Indeed, in her letter of resignation, she stated that she "felt that matters could possible [sic; possibly] be resolved" after she spoke with District Director Fred Morgan on November 4, 1998. She only decided to resign after reading the "untruthful accusations" contained in Julie Thompson's November 3rd letter.[17] She did not quit because of a sexually hostile work environment.

For all of the foregoing reasons, the Court will GRANT Defendant's Motion for Summary Judgment on Plaintiff's constructive discharge claim.

### G. PLAINTIFF HAS NOT MADE OUT A LEGALLY COGNIZABLE RETALIATION CLAIM

■ To make out a retaliation claim under the Michigan civil rights laws requires that the plaintiff establish (1) that he/she opposed violations of the Michigan Civil Rights Act or participated in activities protected by the Act, and (2) that the opposition or participation was *a significant factor* in the adverse employment decision. *Booker v. Brown and Williamson*, 879 F.2d 1304, 1310 (6th Cir.1989). The *significant factor* standard "requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Id.*, quoting *Polk v. Yellow Freight System, Inc.*, 801 F.2d 190, 199 (6th Cir.1986).

■ Once an employee has set forth her *prima facie* case, the employer may establish a legitimate, non-discriminatory

---

17. Thompson's two-page letter [Plaintiff's Ex. L] summarized the actions taken by CPK in response to her complaints of harassment and expressed concern that Plaintiff appeared to not be satisfied. One sentence in that letter mentioned that "Rick [Trexler] has explained to me that your own outbursts which he referred to in his counseling session with you were in reference to your [own] use of profanity and your hostile tone with kitchen staff which preceded your complaint to the managers." *Id.* at p. 2. However, this sentence was

followed by Ms. Thompson's request that Plaintiff call her so that they could discuss "the best way to resolve this dispute once and for all" and added, "we are amenable to any suggestion that you wish to offer that will achieve a resolution that is reasonable and fair to all parties concerned." *Id.*

As is evident from the content of the letter, nothing in it threatened Plaintiff with discipline or any other adverse action with respect to Plaintiff by CPK.

reason for any adverse action, and the plaintiff must show that this reason was a pretext for discrimination. *Jackson v. Pepsi–Cola,* 783 F.2d 50, 54 (6th Cir.1986).

█ In order to constitute an "adverse employment action," an employer must act in a manner that is "materially adverse in that it is more than a mere inconvenience or an alteration of job responsibilities" and "there must be some objective basis for demonstrating that the change is adverse." *Wilcoxon v. Minnesota Mining & Mfg. Co.,* 235 Mich.App. 347, 597 N.W.2d 250 (1999).

█ Plaintiff claims that her supervisors retaliated against her because of her complaints of sexual harassment by her co-workers. In support of this allegation, Plaintiff points to Richard Trexler's admonition that she needed to wear looser fitting pants at work and the counseling she received from Trexler concerning her temper outbursts and her use of profanity at work.

With respect to her wearing looser pants, Plaintiff admitted at her deposition that Trexler told "everyone" that they needed to wear different pants. [Plaintiff's Dep. p. 56.] She complains about his telling her to wear different pants because he whispered this instruction to her on the same day that she had met with him to discuss one of her complaints about the kitchen staff. *Id.* Trexler testified that he repeatedly counseled the female wait staff about their attire and the CPK dress code. [Trexler Dep. pp. 55–56.] Plaintiff admitted that her pants were not consistent with CPK's dress code. Plaintiff, however, was not reprimanded or disciplined for her work attire.

█ Similarly, with respect to being counseled for her outbursts and use of profanity, Plaintiff admitted in her deposition that she sometimes got angry and used profanity. Accordingly, she was appropriately counseled.

Moreover, as indicated above, Plaintiff has admitted that CPK management made sincere efforts to address her concerns regarding the cooks' behavior.

As a consequence of the foregoing, Plaintiff cannot establish any "adverse employment action" that was causally connected to her complaints about the kitchen staff's "harassment" of her. More importantly, even assuming *arguendo* that Trexler's counseling of Plaintiff regarding her work attire and her outbursts somehow did constitute "adverse employment actions," CPK has articulated a non-discriminatory reason for its counseling—that Plaintiff's attire and outbursts were not in conformance with company dress and conduct code. The burden, therefore, is upon Plaintiff to prove the CPK's efforts to counsel her were a pretext for retaliatory discrimination. *Hegwood v. Pharmacia/Upjohn,* 985 F.Supp. 728, 734 (W.D.Mich.1997). Plaintiff has produced no evidence to show that CPK's actions were pretextual. Accordingly, Defendant's Motion for Summary Judgment will also be granted on Plaintiff's retaliation claim.

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED in its entirety with prejudice.

Let Judgment be entered accordingly.