Dorothy J. **DYSERT,** Plaintiff,

v.

**WHIRLPOOL CORPORATION,**
Defendant.

No. 3:00CV7688.

United States District Court,
N.D. Ohio,
Western Division.

Sept. 4, 2001.

Francis J. Landry, Wasserman, Bryan, Landry & Honold, Toledo, OH, for Plaintiff.

Daria A. Carr, Anspach, Serraino, Meeks & Nunn, Toledo, OH, Frederick L. Schwartz, Littler Mendelson, Garrison L. Phillips, Littler Mendelson, Chicago, IL, Stephen R. Serraino, Anspach, Serraino, Meeks & Nunn, Toledo, OH, for Defendant.

## ORDER

CARR, District Judge.

This is a sexual harassment case in which plaintiff brings charges under Title VII and the Ohio Revised Code, as well as common law sexual harassment charges, and intentional infliction of emotional distress. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. Pending is defendant's motion to dismiss. For the following reasons, defendant's motion shall be granted in part and denied in part.

### I. Background

#### A. Plaintiff's Allegations

Plaintiff has been employed by defendant at its Findlay, Ohio facility since 1978. Plaintiff complains of conduct in the workplace that she found sexually offensive.

The first incident occurred in 1996, when plaintiff was employed in scrap salvage. Plaintiff states that she walked into a manager's office and saw a female co-worker sitting on his desk, facing him with her legs spread. Plaintiff felt that this conduct was sexually offensive, and reported it to her foreman. Six months after this incident, plaintiff was transferred from her scrap salvage job to a position in the New Generation Department Test Bay Area ("Test Bay"). Defendant asserts that plaintiff was moved because the company was able to reassign duties, creating one job in scrap salvage instead of two. Defendant asserts that plaintiff was the employee transferred out of scrap salvage because the other employee in scrap salvage had more seniority. (Doc. 45 at 10–12). Plaintiff asserts that the job change was retaliatory. Plaintiff started her new position in February of 1997, and held the position until 1999.

Plaintiff alleges she encountered several incidents which contributed to a sexually offensive environment in the Test Bay. Plaintiff alleges one male co-worker frequently acted as though he were performing oral sex on a female co-worker. Additionally, plaintiff states, the same female worker would sometimes "come out of the test booth and throw her legs apart, grab her crotch," and holler when the male would come by and "grab her butt." (Doc. 30 at 31). Plaintiff alleges that another female co-worker would participate by shaking her breasts and spreading her legs towards the male worker. (*Id.* at 33). Plaintiff alleges that this female worker would often do a "butt dance", which involved bending over, shaking her bottom, and backing up into men's faces. (*Id.* at 123–4).

Plaintiff also alleges that one male co-worker frequently exposed his private parts in the Test Bay area. Plaintiff states that she saw the male expose him-

self at work twice, but that she believed he did it quite frequently. Plaintiff states that she could tell when he was exposing himself, and that she would refuse to look in his direction when he was doing so. (*Id.* at 128).

According to plaintiff, a different male co-worker made comments about pornographic topics, and discussed the fact that he was starting an internet escort service. Plaintiff alleges that this worker told the female workers he was going to inspect them to see what their breast size was, and also told them how his daughter's breasts were developing. Finally, plaintiff alleges that this worker brought pornography into work.

Plaintiff asserts that she complained to her supervisor, Gary Beach, about some of this behavior as early as May, 1997. Plaintiff's deposition testimony indicates that she did not provide Beach with specific details about the behavior, but rather made general comments about "what was going on up there" and stated it was "pretty provocative." (*Id* at 35–6). Plaintiff alleges that Beach told her this was just a "factory atmosphere" she would, apparently, have to get used to. Next, plaintiff asserts, Beach shrugged and walked away. (*Id.*).

Beach retired in August, 1997, and plaintiff asserts that, after Beach's response to her complaint, she decided to wait until her new supervisor took over to pursue things. (*Id.* at 35). Plaintiff asserts that her new supervisor, Bill Freeman, started in September, 1997, and that she complained to him "about what was going on upstairs" about two weeks after he started. (*Id.* at 37–8). Plaintiff asserts that she provided Freeman with the names of some of the individuals whose conduct she found offensive, but again did not provide specific details about the behavior. (*Id.*). According to plaintiff, Freeman did nothing in response immediately after her complaint.[1]

Freeman denies that plaintiff made any complaint to him prior to February, 1999. Additionally, he states that he does not recall the conversation with Steve which plaintiff refers to. Freeman does state, however, that it is possible such a conversation occurred, because he

> had several people coming up to me during that time period saying, you know, boy, you got a mess going on upstairs, and I said, yeah, and that was it, and there were—you know, so that, you know, I don't remember Steve saying anything to me, but you know, several people came up to me and said things like that, so if he said something like that, that's possible.

(Doc. 50 at 10).[2]

Plaintiff alleges that Freeman had a conversation with her in February, 1999,

---

1. Plaintiff alleges that Freeman did nothing until a male co-worker, Steve, spoke with Freeman about the behavior going on in the Test Bay. Plaintiff asserts that after speaking with the Steve in March, 1999, Freeman interviewed the male whom plaintiff named in her complaint. According to plaintiff, the worker called plaintiff a "damn liar." (*Id.* at 41–2). Plaintiff also stated in her deposition that this conversation and interview took place in April, 1998, rather than March, 1999. (*Id.* at 43). It is undisputed that no action was taken by the defendant to end the offen-sive behavior in the Test Bay prior to March, 1999.

2. Plaintiff's deposition is inconsistent with regards to her claim that she directly complained to Freeman in September of 1997. Later her testimony indicates that it was only Steve who spoke with Freeman prior to February, and that February 19, 1999 was the first time she directly reported anything relating to sexually offensive conduct. (Doc. 30 at 108–9). Regardless of the way this factual inconsistency is resolved, however, there is evidence on the record indicating defendant

during which he yelled at her and accused her of being the ringleader of some behavior problems in the Test Bay. At this time, plaintiff alleges that she told Freeman about the behavior she found offensive in the Test Bay, and named the employees she thought he needed to watch. Plaintiff asserts that Freeman then yelled at her and told her to keep her head down and her mouth shut or he would move her to a different position. Freeman states that he never told plaintiff to keep her mouth shut, and that when he told her to keep her head down he was talking with her about how to do her job when she had to work next to someone she had a personality conflict with. (Doc. 50 at 15). Also, Freeman states that he does not recall shaking his finger in plaintiff's face, and that he definitely raised his voice but did not yell at plaintiff. (*Id.* at 16).

Plaintiff called Blane Lau, the Department Manager, on Friday, February 19, 1999, the same day she alleges she had the confrontation with Freeman, to inform him that she had a complaint. Plaintiff states that she wanted to speak with Doug Miller, her HR representative, but that Miller was on vacation for a week. On Monday, February 22, plaintiff asserts that she met with Lau and shared her complaints about the sexually offensive conduct. Plaintiff states that all she wanted was for the offensive conduct to stop.

Defendant asserts that plaintiff refused to speak with Lau beyond telling him that she worked in an "uncomfortable environment", and that Lau contacted the human resources department with this information so that there could be an investigation. Defendant asserts that once Miller returned from vacation, he and Suzanne Dye, the human resources administrator, met with plaintiff to go over her complaints and to begin an investigation.

It is undisputed that the behavior which plaintiff complained of stopped after March 2, 1999. (Doc. 30 at 58).

Plaintiff was moved out of the Test Bay in April, 1999. She was assigned to work in Module 3, where she had to rotate to a station to perform door drop, which required lifting heavy dishwasher doors. This activity caused plaintiff to injure her back.

### B. Defendant's Policy Against Harassment

Defendant's Findlay Division has a policy, published in the Employee Handbook, which prohibits harassment based on age, color, race, religion, sex, sexual orientation, disability, or national origin. (Def.Ex.2). Plaintiff asserts that she was familiar with the policy against sexual harassment. Additionally, plaintiff acknowledges that the policy permitted her to go to her supervisor, department head, or human resource representative, with her complaints about what she perceived to be a hostile work environment. Plaintiff asserts that she chose to go to her foreman, and did not pursue other options. (*Id.* at 48–9).

### II. Analysis

#### A. Hostile Work Environment

■ Claims of hostile work environment sexual harassment under the Ohio Revised Code and Title VII must prove the same elements in order to prevail. In order to establish hostile work environment sexual harassment based on the conduct of co-employees, plaintiff must establish: 1) she belongs to a protected group; 2) she was subjected to unwelcome sexual harassment; 3) the harassment complained of was based on sex; 4) the harassment complained of created an intimidating, hostile, or offensive work environment; and 5) the existence of respondeat superior, i.e., that

was aware of the allegedly harassing conduct        prior to taking action in March of 1999.

the employer knew or should have known of the harassment and failed to take remedial action. *Ciliotta v. Merrill Lynch,* 121 Ohio App.3d 324, 327–8, 699 N.E.2d 997 (1997). For claims under Title VII, the language for the fourth element reads, "the harassment must have unreasonably interfered with plaintiff's work performance or must have created a hostile or offensive work environment that was severe or pervasive." Also, the fifth element omits reference to respondeat superior, and reads, "the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action." *Fenton v. HiSAN, Inc.,* 174 F.3d 827, 830 (6th Cir.1999).

Defendant first asserts that it is entitled to summary judgment because plaintiff has failed to establish the fourth element as a matter of law. To this end, defendant asserts that much of the conduct plaintiff complained of occurred only a limited number of times, or occurred without plaintiff's witnessing it. Defendant notes that after the incident with the worker on the manager's desk, plaintiff does not complain of any conduct until August, 1997, and that plaintiff was on medical leave from January, 1998 until August, 1998. Defendant further asserts that plaintiff didn't know what went on at work while she was gone. (Doc. 30 at 106–8).

■ Defendant raises valid points both about the number of incidents plaintiff witnessed, and about the time period during which plaintiff could have actually been affected by any harassing conduct. I do not find, however, that plaintiff has failed to establish this element as a matter of law. Some of the incidents plaintiff complains about are rather severe. For example, I find that a co-worker exposing himself could be found by a jury to be very severe, even if plaintiff only saw it two times. Additionally, I think the jury could find

credible plaintiff's testimony that she knew when the male was exposing himself, because of the way he was moving or standing across the line, and that she chose not to look at him because she didn't want to be subjected to his actions. In this event, the jury could find this conduct severe or pervasive, and could find that the conduct occurred more than two times.

Furthermore, all the other allegations made by plaintiff, considered together, could cause a jury to find plaintiff was exposed to a hostile work environment which was severe or pervasive, so as to alter plaintiff's working environment.

Defendant also asserts, however, that plaintiff cannot establish the fourth element because she failed to put forth evidence that she subjectively found the environment to be abusive. *See Harris v. Forklift Sys.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (hostile work environment victim must subjectively perceive the environment to be abusive). I disagree. Plaintiff indicated throughout her deposition that she was upset by the behavior she complained of. Plaintiff asserts several instances where she complained about the conduct, both to supervisors and co-workers. Also, plaintiff described an incident where she had to come off the line because she was so upset she was crying at work. All of these allegations indicate that plaintiff found the environment abusive, and would allow a jury to find that such was the case.

Accordingly, I do not find that defendant is entitled to judgement as a matter of law on the fourth element of the prima facie case for hostile work environment sexual harassment.

■ Defendant next asserts that plaintiff has failed to establish the fifth element of the prima facie case as a matter of law. Defendant argues that plaintiff cannot establish that it knew or should have known

of the alleged harassment and unreasonably failed to take prompt and effective remedial action. Defendant asserts that plaintiff has presented no evidence that defendant knew or should have known of the alleged harassment prior to February, 1999. Such is not the case. First, plaintiff, in her deposition, asserts that she first complained to Beach about conduct in the Test Bay in May, 1997. She asserts that she complained to Freeman in September, 1997. Thus, construing the evidence in the light most favorable to plaintiff, I find that a jury could find that defendant knew of the alleged harassment prior to February, 1999.

Additionally, a jury could find that defendant should have known, even if it did not, of the alleged harassment prior to February, 1999. Plaintiff's alleged complaints to both Beach and Freeman prior to February, 1999 were admittedly "general" rather than specific. Thus, a jury could credit plaintiff's allegations that she made each of these complaints, yet find that defendant did not actually know of the specific conduct. A jury could find, however, that these statements were enough to put defendant on notice that something inappropriate was occurring in the Test Bay. In addition to her complaints, plaintiff alleges that her co-worker Steve complained to Freeman. Freeman's own deposition testimony, as quoted above, indicates that several people approached him and informed him that he had a "mess going on upstairs." Finally, plaintiff alleges, and a co-worker confirms, that a sign reading "sexual harassment will not be tolerated, but will be graded" hung on the wall in the Test Bay for "quite some time." (Doc. 52 at 21). In light of these events, a jury could find that defendant should have known about the alleged harassment prior to February, 1999.

Thus, defendant is not entitled to judgment as a matter of law on the fifth element of the prima facie case for hostile work environment sexual harassment.

## B. Common Law Sexual Harassment

█ In order to succeed with a common law claim of sexual harassment, a plaintiff must show that "the harassing employee has a past history of sexually harassing behavior about which the employer knew or should have known." Because I find that the jury could find that defendant should have known of the alleged harassing behavior, including the identity of the alleged harassers, prior to February, 1999, I find that summary judgment in favor of defendant is not appropriate for plaintiff's common law claim.

## III. Retaliation

█ Ohio courts rely on federal law when deciding retaliation claims. Thus, plaintiff's burden for her federal and state retaliation claims is the same. In order to succeed on her retaliation claims, plaintiff must establish the following: 1) she engaged in an activity protected by Title VII; (2) this exercise of her protected civil rights was known to defendant; (3) defendant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Jeffries v. Wal–Mart Stores, Inc.,* 2001 WL 845486, at *3–4, —— F.3d ——, —— – —— (6th Cir.2001).

I find that plaintiff has not established the third and fourth elements of a retaliation claim, and defendant is entitled to summary judgment on the federal and state retaliation claims.

█ An employment action need not result in pecuniary loss to be considered adverse, but it must materially affect the terms and conditions of plaintiff's employment. Factors which courts consider when determining whether an employment

action was materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). The Sixth Circuit has cited these factors with approval. *See Jeffries, supra* 2001 WL 845486, at 7, —— F.3d at ——.

■ The first instance of retaliation plaintiff alleges is her transfer our of scrap salvage following her complaint about the female co-worker on the manager's desk. Plaintiff has not presented any evidence to show the transfer effected a materially adverse change to the terms of her employment. As demonstrated by defendant, the transfer to the Test Bay did not cause plaintiff to suffer a loss of pay, benefits, or shift hours. Plaintiff does not contend these assertions, nor does she allege the existence of any of the other factors outlined in *Crady*.

The next instance of retaliation which plaintiff alleges is her transfer out of the Test Bay in April, 1999, following her February complaint. Again, defendant asserts that the transfer did not effect a materially adverse change, as there was no resulting demotion, loss of pay, or shift change. Again, plaintiff does not respond to these assertions nor does she allege any of the *Crady* factors. As such, I have no basis for finding that plaintiff suffered an adverse employment action.

■ Additionally, even if plaintiff did suffer an adverse employment action in either of her transfers, she is unable to show a causal link between her protected activity—the complaints about sexual harassment—and the adverse action. First, plaintiff has not disputed defendant's assertion that the transfer out of scrap salvage occurred six months after plaintiff's complaint. As such, the timing of the transfer itself does not support an inference of retaliation. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986) (finding four month lapse insufficient to create an inference of retaliation).

■ Plaintiff's transfer out the Test Bay occurred within a month or so after her complaint in February, 1999. Defendant has asserted, however, that this transfer was based on a personality conflict between plaintiff and a co-worker. Plaintiff does not respond to this assertion, thus, I find that, even if the transfer amounted to an adverse employment action, defendant has asserted a legitimate, non-retaliatory reason for the transfer. *See Jeffries, supra*, 2001 WL 845486, at *4, —— F.3d at —— (after employer articulates a legitimate non-retaliatory reason for the adverse action, the burden of production shifts back to the plaintiff to show that the articulated reason is merely a pretext for retaliation).

Thus, I find that plaintiff cannot establish a prima facie case on either of her retaliation claims, and judgment in favor of defendant is appropriate.

## IV. Intentional Infliction of Emotional Distress

In order to establish a claim of intentional infliction of emotional distress under Ohio law, a plaintiff must prove four elements: 1) defendant either intended to cause emotional distress or knew or should have known that its actions would result in serious emotional distress to the plaintiff; 2) defendant's conduct was extreme and outrageous; 3) defendant's actions were the proximate cause of plaintiff's psychic injury; and 4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (1983).

Defendant asserts, in a footnote, that it is entitled to summary judgment on this claim because plaintiff "has not produced even a scintilla of evidence to establish the prima facie elements of" intentional infliction of emotional distress. (Doc. 40 at 18, n. 14).

I find that, construing the record in the light most favorable to plaintiff, plaintiff has alleged facts sufficient to maintain this claim. In addition to the alleged facts, outlined above, regarding the harassing conduct and defendant's knowledge of it, plaintiff has stated that, because of the emotional distress she suffered, she had to take nerve pills. (Doc. 30 at 182). Thus, I find that plaintiff had raised a genuine issue of material fact as to whether she suffered intentional distress.[3]

### Conclusion

Therefore, it is hereby

ORDERED THAT

1. Defendant's motion for summary judgment on plaintiff's sexual harassment claims be, and hereby is, denied;

2. Defendant's motion for summary judgment on plaintiff's retaliation claims be, hereby is, granted;

3. Defendant's motion for summary judgment on plaintiff's intentional infliction of emotional distress be, and hereby is, denied.

So Ordered.

---

**3.** I note that the evidence in favor of plaintiff's claim here does not seem very strong. However, defendant does not present any argument against the claim. Plaintiff has, in fact, produced a scintilla of evidence to establish the prima facie elements, and so I decline to grant judgment in defendant's favor.