**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0091n.06
Filed: February 8, 2005

**No. 03-2101**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KIM COLLETTE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| STEIN-MART, INC., | ) | DISTRICT OF MICHIGAN |
| A Florida Corporation, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SUTTON and COOK, Circuit Judges; ALDRICH, District Judge.*

ALDRICH, District Judge. Ms. Collette worked at a clothing store owned by Stein Mart, Inc. ("SM"). She went to a Christmas party held at the home of an assistant manager after work hours on a Sunday night. On Monday, Collette reported to work. On Tuesday, however, she did not report to work, and her lawyer notified SM that general manager John Davidson had sexually harassed her at the party. SM immediately suspended Davidson and initiated an investigation, but Collette did not return to work. The following Monday, SM terminated Davidson. SM advised Collette of this and asked her to return, but she never did. She claims constructive discharge.

Collette filed suit in district court, alleging that SM committed sex discrimination by permitting a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, and Michigan's Elliot-Larson Civil Rights Act, MCL § 37.2101

_____

* The Honorable Ann Aldrich, United States District Judge, Northern District of Ohio, sitting by designation.

*et seq.* ("MELCRA").[1]  The court granted summary judgment to SM, finding that the harassment was not sufficiently severe or pervasive to create a hostile work environment.  The court also held that SM had an affirmative defense under the Supreme Court's *Ellerth* and *Faragher* decisions because (1) it exercised reasonable care to prevent harassment and promptly foreclosed any possibility of further harassment,  and (2) Collette unreasonably failed to take advantage of corrective opportunities.  For the reasons that follow, we affirm.

## I.  BACKGROUND

On July 30, 2001, SM hired Collette as an associate in its new Portage, Michigan store.  The store's staff included GM John Davidson and assistant managers Debbie Schafer and Jessie Schmidt.  Collette admits that she worked comfortably with all three on a daily basis.  *See* JA 171-77.

On Sunday, December 2, 2001, Davidson, Schmidt and Schafer held a party at Schmidt's home.  After the store closed around 6:00 p.m., Collette and departmental managers Jennifer Overmyer and Amy Harbin bought beer and sat together in Collette's car drinking and talking.  Then they drove to Schmidt's home, arriving at about 7:00 p.m.  Seven people were in attendance: Davidson, Schmidt, Schafer, Collette, Overmyer, Harbin, and a Janel Raber.  *See* JA 181-87.

Collette alleges that when she arrived, Davidson was already intoxicated and soon began to direct sexual comments at her and engage in unwelcome sexual behavior that humiliated her.  Between her arrival and around 8:30-9:00 p.m., Davidson (1) pulled Collette onto his lap and said

---

[1]  The court also granted SM summary judgment on Collette's claim for intentional infliction of emotional distress.  Collette does not appeal that part of the decision.  Davidson is not involved in the appeal, as Collette stipulated to the voluntary dismissal without prejudice of her claims against him.  At oral argument Collette's counsel explained that she has sued Davidson in state court.

"come sit on Daddy's lap"; (2) sang her a song entitled "The Roof is on Fire" and told her he would blow her through the roof with his large penis; and (3) told her he would "f— her until she squealed like a pig," which he illustrated by imitating pig noises. *See* JA 213, *see also* JA 187-91 (Collette dep. at 38 to 42).

The partiers then played a game, during which Collette sat on the floor. Davidson sat behind her and pushed himself against her, asking if she could "feel that," referring to his penis. Davidson told Collette that he knew she was married but would like to "do her." He bragged about his prowess and said that sex with him would be "so good." The game lasted about thirty minutes. *See* JA 17-18; JA 193-97. The record does not disclose whether Collette and Davidson interacted between the game's conclusion at 9:00-9:30 and 10:30 p.m.

At about 10:30 Collette spoke with Schmidt and told him that Davidson was "out of line," whereupon Schmidt told her to ignore Davidson and never discuss the incident again. *See* JA 196-98. Collette went back to the living room and sat on the sofa next to Overmyer; Davidson joined them and the three talked. Davidson put his arm around Collette and placed his hand on her thigh. She got off the sofa, went to the kitchen, and told Schafer that someone had to talk to Davidson because he was "out of line." Schafer suggested Collette was partly at fault because she had laughed at some of Davidson's behavior. Dissatisfied, Collette left the party. *See* JA 199-201.

The next day, Monday, December 3, Collette worked a 5 to 9 p.m. shift, while Davidson, Schmidt and Schafer stood behind her whispering. *See* JA 202-204 and 208. Collette did not bring Davidson's conduct the night before to anyone else's attention. On Tuesday, December 4, however, Collette did not report for work, and her attorney advised SM counsel O'Toole that Davidson had sexually harassed her at the party. It is undisputed that O'Toole (1) immediately began investigating

by calling Davidson, Schmidt and Schafer, (2) suspended Davidson pending the outcome, and (3) contacted SM District Director Monty Bibb and asked him to come to Portage to investigate. Bibb arrived on Friday, December 6 and took written statements from everyone who had been at the party.

On three occasions SM contacted Collette's counsel and unconditionally asked her to return to work: by phone on December 7, while Davidson was suspended; by letter on January 16, 2002, over a month after SM terminated Davidson; and by letter in August 2002. Both letters advised Collette that Davidson no longer worked for SM, but she refused to return to work. *See* JA 209-11.

In March 2002 Collette filed a charge with the EEOC, which issued a right to sue letter. Collette brought suit in the U.S. District Court for the Western District of Michigan, alleging that SM violated Title VII's prohibition on sex discrimination by intentionally "creating an objectively hostile and intimidating work environment of the severity which" injured her. She further alleged that SM ratified Davidson's conduct, thereby creating "an objectively intimidating and hostile and offense [sic] work environment" in violation of MELCRA. *See id.* ¶¶ 14-22 (JA 19-21). In August 2003 the district court granted summary judgment to SM, and Collette timely appealed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *See Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004) (citation omitted). The district court's findings of fact are reviewed only for clear error. *See Howard v. City of Beavercreek*, 276 F.3d 802, 805 (6th Cir. 2002) (citation omitted). Where there are no disputed material facts, however, we simply determine *de novo* whether the district court properly applied the governing legal principles. *See Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (citation omitted).

## III.  COLLETTE'S TITLE VII CLAIM

A.    Legal Standard:  Summary Judgment

The purpose of a motion for summary judgment is to determine if genuine issues of material fact exist to be tried.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  As the party seeking summary judgment, SM bore the burden of showing that the pleadings, depositions, interrogatory answers, admissions and affidavits established the absence of genuine issues of material fact.  *See id*. at 323.  SM had to discharge that burden by showing that there was an absence of evidence to support Collette's case.  *See id.*

Summary judgment was appropriate if Collette failed to establish the existence of an element essential to her case, and on which she would have borne the burden of proof at trial.  *See Whitley v. Spencer Cty. Police Det.*, 178 F.3d 1298, 1999 WL 196499, at *2 (6th Cir. Mar. 26, 1999) (citing *Celotex*, 477 U.S. at 322).  Collette was not entitled to rest on her pleadings, but had to come forward with evidence that would allow a rational factfinder to find in her favor.  *See Bridgeport Music*, 371 F.3d at 889 (citation omitted).  Because Collette was opposing summary judgment, her factual allegations were to be believed and all justifiable inferences drawn in her favor.  *See DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (citation omitted).  But the ultimate burden of demonstrating the existence of a genuine issue of material fact always remained on Collette.  *See id.*

B.    Employer Liability for Supervisor Sexual Harassment under Title VII

1.    <u>Sexual Harassment Giving Rise to Hostile Work Environment</u>

Title VII provides, in pertinent part: "It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(a)(1). Collette alleged that SM allowed the harassment to create a hostile work environment which resulted in her constructive discharge.

To hold SM liable, Collette had to show that she was subjected to unwelcome harassment based on her sex, the harassment created a hostile work environment, and SM failed to take reasonable action to prevent and correct the harassment. *See Schramm v. Slater*, 2004 WL 1595195, at *4, __ Fed. Appx. __ (6th Cir. July 14, 2004) (citing *Williams v. GMC*, 187 F.3d 553, 560-61 (6th Cir. 1999)). To establish a hostile environment she had to show that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment." *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal citations omitted).

2.      Constructive Discharge in the Wake of Sexual Harassment

*Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir. 1987) is our seminal decision on constructive discharge. There we held that **"**[p]roof of discrimination alone is not a sufficient predicate for a finding of constructive discharge; there must be other 'aggravating factors.'January 25, 2005" *Id.* at 637. "The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). This heightened constructive discharge standard requires an objective assessment of the employee's feelings, and an inquiry into the employer's intent and the foreseeability of the impact its conduct had on the employee. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002).

The objective inquiry focuses on whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004) (citations omitted); *see also Pa. State Police v. Suders*, __ U.S. __, 124 S.Ct. 2342, 2347 (2004) (plaintiff must show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response.").

The "employer" inquiry focuses on whether the employer *intended* the work environment to cause the employee to resign. *See Yates*, 819 F.2d at 637; *accord MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004) ("constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a *deliberate attempt* to compel such a resignation") (emphasis added) (citation omitted). In ascertaining the employer's intent, the court may consider whether it was reasonably foreseeable that the harassment and the employer's handling of it would cause the employee to resign. *See Moore*, 171 F.3d at 1080. Under this test, "the feelings of a reasonable employee would not be enough to show discharge without at least some foreseeability on the part of the employer." *Starks v. New Par*, 181 F.3d 103, 1999 WL 357757, at *5 (6th Cir. May 11, 1999) (quoting *Yates*, 819 F.2d at 637).

3. Employer's Liability for Supervisor's Sexual Harassment of Employee

The Supreme Court distinguishes between supervisor harassment unaccompanied by an adverse official act and supervisor harassment accompanied by "a tangible employment action." An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998); *accord Faragher v. Boca Raton*, 524 U.S. 775, 808 (1998). But when the employer takes no tangible adverse action, it may raise a defense comprised of two elements:

"(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Suders*, __ U.S. at __, 124 S.Ct. at 234 (quoting *Ellerth*, 524 U.S. at 765). This is known as the *Ellerth/Faragher* defense.

C.     Discussion [2]

We need not consider the district court's holding that Collette failed to make a *prima facie* case of hostile work environment sex discrimination and constructive discharge, because even if she had, SM had a meritorious *Ellerth-Faragher* defense. "[W]hen no tangible employment action is taken, the employer may defeat vicarious liability for supervisor harassment by establishing, as an affirmative defense, both that 'the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and that 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Suders*, 124 S.Ct. at 2253-54 (citations omitted).

Collette alleges constructive discharge, but the Supreme Court recently held that "an employer does not have recourse to the *Ellerth*/*Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment."

---

[2]     Harassment is actionable under Title VII "only if it is so severe and pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (citations and internal quotations omitted). The district court did not address whether the harassment was sufficiently "severe or pervasive." We need not address that issue either, because other factors suffice to sustain the grant of summary judgment to SM.

-8-

*Suders*, 124 S.Ct. at 2351; *see also id.* at 2355 n.9 ("Tellingly, we stated that Ellerth 'ha[d] not alleged she suffered a tangible employment action,' despite the fact that her complaint alleged constructive discharge.") (quoting *Ellerth*, 524 U.S. at 766). Thus constructive discharge cannot serve as an adverse employment action for this purpose, since SM took no action that could be construed as such against Collette. Therefore SM may assert the *Ellerth-Faragher* defense.

1.    SM Could Not Have Known About the Harassment Until at Least Dec. 3

It is undisputed that the only harassment took place on the night of Sunday, December 2. Collette did not report it to SM's counsel or upper management until Tuesday, December 4, but she complained to assistant managers Schmidt and Schafer on the night of the 2nd. They could have informed SM's counsel or upper management of Collette's complaint when they went to work on Monday the 3rd. If they did not do so, SM would have first learned of Collette's complaint when her counsel contacted SM's on Tuesday the 4th. *Cf. Courtney v. Landair Transport*, 227 F.3d 559, 565 (6th Cir. 2000) ("It was not until December 4, 1996, when defendant received the lawyer's letter asking defendant to stop the harassment, that defendant had notice of the harassment.").

Moreover, Collette testified that she worked comfortably with Davidson and everyone else without incident in the months before the party, so SM had no reason even to *suspect* that Davidson or anyone else might harass her. *Cf. Stone-Graves v. Coop. Elevator Co.*, 2003 WL 1867921, at *6 (E.D. Mich. Mar. 12, 2003) (plaintiff had praised alleged harasser's "exceptional management" and "affirmatively indicated that she had no complaints with any other employees or customers," so a jury could not find that the employer had notice of the alleged harassing behavior).

Thus SM could not have known about Collette's allegation until at least Monday, December 3. Compare *Stevens v. USPS*, 21 Fed. Appx. 261, 264, 2001 WL 1298955, at *2 (6th Cir. Aug. 7, 2001) (employer had no reason to know of alleged harassment before employee reported it) with *Minnich v. Cooper Farms*, 39 Fed. Appx. 289, 2002 WL 1396910 (6th Cir. June 26, 2002) (genuine issued existed as to whether employer knew or should have known about harassment, as plaintiffs had complained numerous times over course of months).

2.      SM Took Sufficient Steps to Prevent Sexual Harassment Generally

The next element of the *Ellerth/Faragher* defense requires SM to show that it "exercised reasonable care to prevent" this type of harassment.[3]  SM satisfies this element.

Preliminarily, there was no evidence that SM generally tolerated sexual harassment or did not take it seriously.  *Contrast Dysert v. Whirlpool Corp.*, 167 F. Supp. 2d 967, 973 (N.D. Ohio 2001) (coworker confirmed plaintiff's allegation that department where alleged harassment occurred had "a sign reading 'sexual harassment will not be tolerated, but will be graded'").  On the contrary, it is uncontested that SM had policies explicitly prohibiting workplace sexual harassment and that

_____

[3]      We had held that "mere negligence as to the content of the response cannot be enough to make the employer liable.  When an employer responds with good faith remedial action, * * * it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination."  *Weigold v. ABC Appliance Co.*, 2004 WL 1543165, at *7-8 (6th Cir. July 7, 2004) (quoting *Blankenship v. Parke Care Ctrs.*, 123 F.3d 868, 873 (6th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998)).

*Ellerth* and *Faragher*, however, speak of the employer's duty to exercise "reasonable care" in fashioning a remedy for unlawful discrimination.  Thus an employer may be held liable when its remedial response is merely negligent, however well-intentioned.  *See Madeja v. MPB Corp.*, 821 A.2d 1034, 1042-43 (N.H. 2003) (*Ellerth* and *Farragher* effectively overruled *Blankenship*); *cf. Petty v. DHL Airways*, 176 F. Supp. 2d 773, 778 (S.D. Ohio 2003) (employer's reliance on *Blankenship* was misplaced); *Farra v. GMC*, 163 F. Supp. 2d 894, 906 n.8 (S.D. Ohio 2001) (discussing compatibility of *Blankenship* with *Ellerth*).

it distributed materials informing the employees of these policies. SM's "Standard Operating

Procedures" memorandum on Sexual Harassment stated, in part:

> Policy
> Stein Mart is committed to providing a work environment for all associates that is free from all forms of discrimination, including harassment. Harassment of an associate because of the associate's ... sex ... is a form of discrimination and will not be tolerated. Any associate who engages in such conduct will be made to bear the full responsibility of [sic] such unlawful conduct and will be subject to appropriate discipline up to and including termination of employment.
>
> Prohibited Conduct
>
> * * *
>
> While it is impossible to provide an exhaustive list of the types of behavior that could constitute harassment or sexual harassment, the following list contains examples of behavior that will not be tolerated:
>
> * Unwanted sexual advances, flirtation, or propositions;
> * Verbal abuse of a sexual nature, including offensive noises and gestures;
> * Explicit or degrading comments or jokes about another individual or his or her appearance, race, age, etc.
> * The display of sexually suggestive pictures or objects;
> * Any offensive or abusive physical contact;....
>
> * * *
>
> Reporting Harassment
> Any associate who believes that he or she has been the victim of harassment or sexual harassment, or who has witnessed such behavior, or who has any knowledge of such behavior should promptly report it to his or her immediate supervisor. If the associate's immediate supervisor is involved in the conduct, or if for any other reason the associate is not comfortable reporting it to the immediate supervisor, the associate should report the behavior to the Store Manager, Regional Vice President, Director of Associate Relations, or the Vice President of Human Resources.
>
> Associates can use the following toll-free telephone number to contact any member of management at Stein Mart's corporate headquarters, including Kevin O'Toole, Director of Associate Relations, and Hunt Hawkins, Vice President of Human Resources: * * *
>
> Associates may also mail information to corporate headquarters at: * * *

JA 132, 133. The policy promised thorough and appropriate remedial action. *See* JA 134. On the

day Collette was hired, she signed a form acknowledging that she had received, read and understood

the policy. She also testified that assistant manager Schmidt went over the policy with her during her orientation. *See* JA 135 (signature page) and JA 178-80 (Collette dep. at 21:17 to 23:12).

The Supreme Court has stated, "While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Faragher*, 524 U.S. at 807. We have elaborated that giving employees written notice of such policies and how they are enforced constitutes an adequate general preventive measure. *See Leugers v. Pinkerton Security & Investigative Servs.*, 205 F.3d 1340, 2000 WL 191685, at *3 (6th Cir. Feb. 3, 2000); *accord Roelen v. Akron Beacon Journal*, 199 F. Supp. 2d 685, 693-94 (N.D. Ohio 2002).

Our decision in *Leugers* was unpublished and therefore not binding precedent. It bears noting, then, that other Circuits also treat the existence of an anti-harassment policy (with complaint procedures) as *strong* evidence that the employer took sufficient general measures to prevent harassment. *See An v. Regents of Univ. of Calif.*, 2004 WL 188192, at *5, 94 Fed. Appx. 667, 674 (10th Cir. Feb. 2, 2004) ("the sexual harassment policy and its dissemination generally evidence appropriate efforts to prevent sexual harassment"); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) ("not necessarily dispositive" but "an important consideration"), *cert. denied sub nom. Metro-North Commuter R.R. v. Norris*, 529 U.S. 1107 (2000); *Gawley v. Indiana Univ.*, 276 F.3d 301, 312 (7th Cir. 2001) ("In the face of this evidence that the university had a procedure in place to handle harassment, Gawley has no evidence that the university failed to exercise reasonable care in preventing ... the harassing behavior").

-12-

The employer cannot merely have an anti-harassment policy; it must also disseminate or publicize it. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314-15 (4th Cir. 2001). It is undisputed that by the time of the party, Davidson had received and understood SM's anti-harassment policy. *See* JA 97-99, 105. SM still had to show, of course, that it took adequate corrective measures after learning of Collette's particular complaint, i.e. that it *enforced* its policy.

3.  SM Acted Promptly and Decisively to Stop the Specific Sexual Harassment

As noted above, SM initiated an investigation, including interviews of everyone else who attended the party, as soon as Collette relayed her complaint to SM's counsel. "The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001). By doing so, "the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace." *Id.*

SM also immediately suspended Davidson pending investigation, then terminated him six days later. There were only two days when Collette could have been forced to work in the same store with Davidson: Monday, December 3, when her counsel had not yet reported the harassment to SM, and Tuesday, December 4, when SM learned of the allegation and suspended Davidson.

SM's corrective measures epitomized how a responsible employer should act when confronted with an allegation of employment discrimination. By comparison, in one case the plaintiff complained that management did not immediately assign work schedules that kept her apart from her harasser, requiring her to work with him for three days. "Under the circumstances," we held, "a three-day delay does not constitute an unreasonable failure to take prompt corrective action." *Stevens v. USPS*, 21 Fed. Appx. 261, 264, 2001 WL 1298955, at \*2 (6th Cir. Aug. 7, 2001);

-13-

*see also Harris v. Lincoln Electric*, 54 F. Supp. 2d 719, 724 (N.D. Ohio 1998) (employer did not exhibit indifference by letting week and a half go by between victim's request to be moved and decision to move her away from harasser), *aff'd o.b.*, 181 F.3d 101, 1999 WL 357770 (6th Cir. May 14, 1999).[4]

### 4. Collette Unreasonably Failed to Avail Herself of Corrective Measures

The last element of the *Ellerth/Faragher* defense requires the employer to show that the plaintiff failed to take advantage of opportunities to prevent or correct the harassment. SM satisfies this element. Collette knew she could call a toll-free number to elevate her complaint directly to headquarters, but she never did so. *See* JA 211-12. Most significantly, knowing that SM had terminated Davidson, Collette failed to avail herself of the ultimate corrective opportunity: returning to work with the harasser permanently out of the picture.

As we stated in a similar case, "after her complaint to ... management resulted in the firing of one supervisor and the disciplining of another, Plaintiff knew that the company would take any other complaint seriously. ... [N]o reasonable person in Plaintiff's situation would have felt forced to quit when she did." *Montero v. Agco Corp.*, 192 F.3d 856, 861 (9th Cir. 1999). *Cf. Stacy v. Shoney's*, 955 F. Supp. 751, 756 (E.D. Ky. 1997) ("Because Stacy never returned to work ..., she cannot show that Shoney's action was ineffective."), *aff'd*, 142 F.3d 436, 1998 WL 165139 (6th Cir. Mar. 31, 1998); *contrast Stewart v. Cartessa Corp.*, 771 F. Supp. 876, 881 (S.D. Ohio 1990) ("*Based*

---

[4]      *See also*, holding that employer did enough to avoid liability, *Fenton v. HiSan, Inc.*, 174 F.3d 827, 830-31 (6th Cir. 1999) (immediately relayed complaint to HR, met with alleged harasser five days later, and moved his workstation, and further action was rendered unnecessary by accuser's resignation); *Wathen v. GE*, 115 F.3d 400, 406-407 (6th Cir. 1997) (terminated one harasser, disciplined another, and publicly apologized to victim); *Flenor v. Hewitt Soap Co.*, 81 F.3d 48 (6th Cir.) (reprimanded harasser, and harassment stopped thereafter), *cert. denied*, 519 U.S. 863 (1996).

-14-

*upon a history of nonresponsiveness to her complaints about [harasser]'s conduct*, plaintiff declined to return to work after her meeting with the president,....") (emphasis added).

## IV. COLLETTE'S MELCRA CLAIM

**A.    Legal Standard**

When interpreting state law, we look first and foremost to decisions of the state's own courts. *See Bernstein v. Lopez*, 321 F.3d 903, 909 (9th Cir. 2003) (Pregerson, J. dissenting).  If state court precedent is definitive, we must follow it.  *See Foster v. Caterpillar Tractor Co.*, 714 F.2d 654, 657 n.3 (6th Cir. 1983) (citation omitted).  Under MELCRA, "an employer may not discriminate on the basis of sex, and this also prohibits sexual harassment."  *James v. TCF Nat'l Bank*, 2003 WL 22161828, at *1 (Mich. App. Sept. 18, 2003) (citing *Chambers v. Trettco, Inc.*, 614 N.W.2d 910 (Mich. 2000)).  "Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature if:  (1) submission to the conduct of communication is made a term or condition, either explicitly or implicitly, to obtain employment; (2) submission to or rejection of the conduct or communication is used as a factor in determining the individual's employment; or (3) the conduct or communication has the purpose or effect of substantially interfering with an individual's employment by creating a hostile environment."  *James*, 2003 WL 22161828 at *1 (citing Mich. C.L. 37.2103(i) and *Chambers*, 614 N.W.2d 910).

To establish a sexual harassment claim based on a hostile work environment under MELCRA, Collette had to show that she belonged to a protected group, that she was subjected to unwelcome sexual conduct or communication on the basis of her sex which was intended to or did

substantially interfere with her employment or created an intimidating, hostile, or offensive work environment. *See James*, 2003 WL 22161828 at *1 (citing *Chambers*, 614 N.W. 2d 910).

The court considers whether, under all the circumstances, a reasonable person would perceive the conduct at issue as substantially interfering with his employment or as having the purpose or effect of creating a hostile, intimidating, or offensive employment environment. *See James*, 2003 WL 22161828 at *2 (citing *Burns v. City of Detroit*, 660 N.W.2d 85 (Mich. 2002), *modified in part o.g. and app. denied in part*, 658 N.W.2d 468 (Mich. 2003)). *See, e.g., Shepard v. Uniboring*, 72 Fed. Appx. 333, 335-36, 2003 WL 21782604, at *1-2 (6th Cir. July 31, 2003) (supervisor's offensive and annoying comments and behavior, without physical touching or threatening, did not create hostile work environment under MELCRA), *cert. denied*, __ U.S. __, 124 S.Ct. 1435 (2004).

Unlike federal case law interpreting Title VII, a hostile work environment claim under MELCRA requires the employee to show that the harassment was "sufficiently severe and persistent to affect seriously [her] psychological well being." *Langlois v. McDonald's Restaurants of Mich.*, 385 N.W.2d 778, 782 (Mich. App. 1986).

Once an employee satisfies the elements of a hostile work environment sex discrimination claim, he can hold the employer liable under MELCRA for his supervisor's harassing behavior only if he shows that "the employer failed to take prompt and adequate remedial action after having been put on notice of the sexual harassment." *Schemansky v. California Pizza Kitchen*, 122 F. Supp. 2d 761, 772 (E.D. Mich. 2000) (citing *Radtke v. Everett*, 501 N.W.2d 155 (Mich. 1993)).

Moreover, under Michigan case law, a single incident is generally insufficient to constitute a hostile work environment unless it was "severe and perpetrated by an employer in a closely-knit

working environment." *James*, 2003 WL 22161828 at *2 (citing *Radtke v. Everett*, 501 N.W.2d 155 (1993) (employer physically restrained employee for more than one minute while he tried to kiss her)). *See, e.g., Langlois*, 385 N.W.2d 778 (hostile work environment not created by one incident where supervisor requested "some fun" and touched employee on breast and buttocks).

**B.      Discussion**

For the reasons discussed in the Title VII analysis, Collette's MELCRA claim fails because she did not raise a genuine issue as to whether the unwelcome conduct or communication substantially interfered with her employment or created an intimidating, hostile or offensive work environment. Similarly, Collette did not raise a genuine issue as to whether she was constructively discharged. *See, e.g., Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 775-76 (6th Cir. 1996) (applying Michigan law); *Selph v. Gottlieb's Financial Servs.*, 35 F. Supp. 2d 564, 568 (W.D. Mich. 1999) (under Michigan law, female employee's testimony that male coworker ceased alleged harassment one day after she reported it precluded finding that she was constructively discharged).

Lastly, even if Collette showed a genuine issue as to each element of her MELCRA claim, as a matter of law SM took prompt, decisive action to ensure that Davidson could never harass her again. Under Michigan law, the critical test of whether the employer's corrective action was adequate is whether it stopped the harassment. *See Houghtaling v. Bay Med. Ctr.*, 1997 WL 33353513, at *1 (Mich. App. Mar. 14, 1997) ("Defendant's actions were effective in that the doctor was thwarted from future misconduct, as evidenced by the fact that he did not harass plaintiff again after the initial incident."), *app. denied*, 577 N.W.2d 685 (Mich. 1998).

## V. CONCLUSION

"It is a fair question to ask who should bear the responsibility for a single incident of supervisor sexual harassment, an innocent employee like [Collette] or an employer like [Stein Mart] who effectively stops the harassment after it learns about it. One could argue [that Stein Mart] should bear the risk of supervisor sexual harassment, as opposed to the innocent [Collette]. However, the Court has rejected this theory of vicarious liability. * * * The underlying theme under Title VII is employers should nip harassment in the bud. That is exactly what happened here." *McCurdy v. Arkansas State Police*, 375 F.3d 762, 772 (8th Cir. 2004). Therefore we affirm the grant of summary judgment to Stein Mart.

COOK, Circuit Judge, concurring. I agree with the majority that Stein Mart established entitlement to the Ellerth-Faragher affirmative defense to Title VII liability and, similarly, that its prompt remedial response foreclosed Collette's sexual harassment claims under Michigan law. Accordingly, I concur in the decision to affirm the district court's grant of summary judgment to Stein Mart.